**UNITED STATES**

v.

Vonrico C. **WILLIAMSON**, 412–43–3637 Gas Turbine Systems Technician (Mechanical) Fireman Apprentice (E–2), U.S. Navy.

**NMCM 93 01991.**

U.S. Navy–Marine Corps
Court of Criminal Appeals.

Sentence Adjudged 23 August 1991.

Decided 28 March 1995.

614

LT B.C. Lansing, JAGC, USNR, Appellate Defense Counsel.

LT Scott A. Browne, JAGC, USNR, Appellate Government Counsel.

Before LARSON, WELCH and McLAUGHLIN, JJ.

LARSON, Chief Judge:

Pursuant to his pleas, the appellant was convicted of assault upon a superior petty officer in the execution of his office and of carrying a concealed weapon, in violation of Articles 91 and 134, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 891, 934, respectively. He was sentenced to confinement for 5 months, forfeiture of $500.00 pay per month for 5 months, reduction to pay grade E-1, and a bad-conduct discharge. The convening authority approved the sen-

tence and the case is now before us for review under Article 66, UCMJ, 10 U.S.C. § 866.

The appellant assigns three errors on review.[1] In his concurring opinion, Judge McLaughlin addresses the third assigned error; I concur with his resolution of that issue and will fashion the ultimate disposition of this case in accordance with his reasoning. The second assigned error is rejected as devoid of merit without further comment. As to the first assignment of error, we concur with the appellant's position and find that the record did not establish an adequate factual basis for a finding of guilty to an attempt-type assault. Accordingly, we will set aside the findings of guilty to Charge II and the specification thereunder. Our reasoning is set forth below.

## I.

The appellant was charged with assaulting his superior petty officer by "running after him with two knives with blades in excess of three inches exposed and yelling 'I'm going to kill you.'" He pleaded guilty, by exceptions and substitutions, to assault by "going after him with two knives." Although the appellant was charged under Article 91, UCMJ, the "assault" version of that offense is identical to that charged under the generic assault statute, Article 128, UCMJ, 10 U.S.C. § 928. Manual for Courts–Martial, United States, 1984 [MCM], Part IV, ¶ 15c(3). Under that article, this was an "attempt" type assault, vice an "offer" type. MCM, Part IV, ¶ 54c(1)(b). The key element of an attempt-type assault, and the one that concerns us here, is that the accused "attempted to do bodily harm" to the victim.

The military judge correctly tailored this element of the offense to conform to the appellant's plea. He also defined an "attempt to do bodily harm" as an "overt act which amounts to more than mere preparation." Record at 18. After the appellant

agreed that the elements accurately described his conduct, the military judge then asked him to describe in his own words what happened. The appellant then set forth the following facts. He and the assault victim, Petty Officer First Class C, engaged in an argument in the engine room of their ship after which C left the engine room. The appellant, who already had one knife in his pocket, obtained a second knife from a shipmate, put that knife in his pocket, and proceeded out of the engine room in search of C about 3 minutes after C departed. His purpose was, in his own words, to "hurt Petty Officer [C]." Record at 20. He apparently went up a ladder and determined that C was not in the passageway. No other fact pertinent to this issue was developed on the record.

On appeal, the appellant argues that the inquiry is insufficient because it reveals that he was never in a position to effect a battery upon his victim. Specifically, there is no indication that, once he commenced his search, the appellant ever actually approached C or that the appellant ever removed the knives from his pockets. The Government counters with the argument that the appellant's acts of obtaining an extra knife and proceeding to a location where he expected to confront C went well beyond "mere preparation."

## II.

 Rule for Courts–Martial [R.C.M.] 910(e) and *United States v. Care*, 18 C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969), require the military judge to elicit a factual basis for each element of the offense before he may accept the plea and enter a finding of guilty based upon the plea. *United States v. Chambers*, 12 M.J. 443 (C.M.A.1982); *United States v. Evans*, 35 M.J. 754 (N.M.C.M.R. 1992). In response to an assertion on appeal that the factual basis for the plea is inade-

---

1. I. APPELLANT'S GUILTY PLEA TO AN ATTEMPT–TYPE ASSAULT WAS IMPROVIDENT BECAUSE THE MILITARY JUDGE FAILED TO ELICIT A FACTUAL PREDICATE FOR AN OVERT ACT BEYOND MERE PREPARATION.

 II. THE MILITARY JUDGE ERRED BY ADMITTING PROSECUTION EXHIBIT 5 INTO

EVIDENCE DURING PRESENTENCING INASMUCH AS APPELLANT'S BODY FAT WAS IRRELEVANT TO THE OFFENSES AT HAND AND WAS UNFAIRLY PREJUDICIAL.

 III. APPELLANT HAS BEEN PREJUDICED BY THE TWO–YEAR POST–TRIAL DELAY IN THIS CASE. (Citations omitted.)

quate, we will search the record of trial to determine whether we have a substantial basis to question the providence of the plea. *United States v. Newsome*, 35 M.J. 749 (N.M.C.M.R.1992), *aff'd*, 38 M.J. 464 (C.M.A. 1993).

■ To determine whether the appellant's acts were sufficient to amount to an attempt-type assault, we look to the law of attempt under Article 80, UCMJ, 10 U.S.C. § 880, and its interpretation in the Manual for Courts–Martial and the case law. An overt act is sufficient to constitute an attempt if it "goes beyond preparatory steps and is a direct movement toward the commission of the offense." MCM, Part IV, ¶ 4c(2). Furthermore, the overt act must amount to a "substantial step" toward commission of the intended crime, and it must be an act that is strongly corroborative of the firmness of the accused's criminal intent. *United States v. Byrd*, 24 M.J. 286 (C.M.A.1987); *United States v. Mandujano*, 499 F.2d 370 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975); *United States v. Wilmoth*, 34 M.J. 739 (N.M.C.M.R.1991).

### III.

In *United States v. Anzalone*, 41 M.J. 142 (C.M.A.1994), our superior Court found certain overt acts, that were similar in many respects to the acts in this case, to be sufficient to establish the providence of the accused's guilty plea to an attempt-type assault. In that case, following a verbal confrontation with the victim, Anzalone retrieved his rifle, chambered a round of ammunition, and headed for the tent where he knew the victim to be. He was intercepted some 20–50 yards away from the victim by two other noncommissioned officers. *Id.* at 143. The Court concluded that Anzalone went beyond mere preparation, pointing specifically to the accused's own admission, made during the *Care* inquiry, that he had done "all [he] could do" short of accomplishing the crime. *Id.* at 146.

There are two significant features of *Anzalone* that are not present in the record in this case. Anzalone knew where his victim was, and he would have completed the assault if he had not been prevented from doing so by the intervention of the two noncommissioned officers. It is evident that these particular features were factors in the majority's conclusion that Anzalone went beyond mere preparation. *See also United States v. Church*, 32 M.J. 70, 73 (C.M.A.) (where accused's completion of all acts he believed necessary to complete contract murder of his wife held sufficient to constitute attempted murder), *cert. denied*, 501 U.S. 1231, 111 S.Ct. 2853, 115 L.Ed.2d 1021 (1991); *United States v. Crocker*, 35 C.M.R. 725, 1964 WL 4970 (A.F.B.R.1964) (accused's act of advancing toward his intended victim with an open knife displayed at a time when an affray was imminent went beyond mere preparation). Even with these facts, the majority opinion by Judge Wiss prompted a strong dissent, in which Judge Gierke, joined by Judge Cox, labeled Anzalone's acts as no more than an "attempted attempt," which is not a crime. *Anzalone*, 41 M.J. at 149 (Gierke, J., dissenting with Cox, J., concurring). *See also Lamb v. State*, 93 Md.App. 422, 613 A.2d 402 (1992) (lengthy discussion of law of attempt which concludes that there is no such crime as an attempted attempt-type assault), *cert. denied*, 329 Md. 110, 617 A.2d 1055 (1993).

■ We do not read *Anzalone* to mean that, in order to be guilty of an attempted battery, the appellant had to place himself in measurable physical proximity to the victim or establish that he would have completed the crime but for external intervention. The law is clear that the accused need not reach the doorstep of completion of the crime, nor is it required that the appellant be prevented from completion only by forces beyond his control. *United States v. Schoof*, 37 M.J. 96 (C.M.A.1993); *Wilmoth*, 34 M.J. at 745; *United States v. Miller*, 30 M.J. 999 (N.M.C.M.R.1990); *United States v. Gugliotta*, 23 M.J. 905 (N.M.C.M.R.1987). However, both these factors—physical proximity and the presence or absence of intervention—play heavily in determining whether the acts constitute a substantial step toward commission of the crime, particularly when the intended crime is an attempt-type physical assault. *Anzalone; see also* 2 WAYNE R. LA-FAVE AND AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 7.16(a), at 313 (1986) (stat-

ing that "assault of the attempted-battery type is committed only when the defendant gets near to committing a battery.").

## IV.

 We recognize that the line between a preparatory step and a substantial step toward the commission of the crime is often difficult to draw.[2] A common thread through the case law and the commentary that discuss where that line should be drawn is that each case must be decided on its own facts. *See United States v. Choat,* 7 C.M.A. 187, 21 C.M.R. 313, 317, 1956 WL 4584 (1956) (holding that the distinction between a preparatory step and a substantial step constituting a direct movement toward commission of the intended offense is one of fact, not law); ROLLIN N. PERKINS AND RONALD R. BOYCE, CRIMINAL LAW 619 (3d ed. 1982) ("Each case, it must be emphasized, must be considered in light of all the facts involved."). Also, it is apparent that the term "substantial" is a relative one so that what may constitute a substantial step toward commission of the intended crime under one set of facts may be mere preparation under another.

## V.

 Applying the applicable law to the facts of record in this case, we find the factual basis for a plea to an attempted battery to be substantially incomplete and therefore insufficient to support the plea. Its shortcoming is the total absence of any indication of what happened beyond the discovery by the appellant that his intended victim was not in the immediate vicinity. We cannot even determine whether the appellant actually expected to find C waiting for him in the passageway and intended his attack to occur there. Considering the facts that passageways are ordinarily used for transit and that a few minutes had lapsed between C's exit from the engine room and the appellant's, it is unlikely that he actually expected to find C waiting for him there. We only know that C was not there; we do not know where on the ship he was, or even if he was still aboard (the ship was not at sea), and what further steps, if any, were taken by the appellant to locate him.[3] Furthermore, the record does not show whether the appellant ever came anywhere near C, whether he was prevented from completing the assault by external forces, whether he was persuaded to desist by a friend, or whether he quit the search of his own accord, and, if so, whether he simply put his planned retaliation on "hold" or whether he voluntarily and permanently renounced his criminal intent.[4] Likewise, we do not know whether the appellant ever removed his weapons from his pocket and, if he did, whether he displayed them in a threatening manner. Like our Air Force

2. Indeed, the facts may reveal that the line of demarkation is not a line at all but a murky "twilight zone." *Schoof,* 37 M.J. at 103 (citing ROLLIN N. PERKINS AND RONALD R. BOYCE, CRIMINAL LAW 617 (3d ed. 1982)). Yet, despite its murky nature, our task remains to determine where in the factual spectrum that zone lies before we determine whether the appellant's conduct falls within it.

3. *Cf. O'Dell v. Armontrout,* 878 F.2d 1076 (8th Cir.1989), *cert. denied,* 493 U.S. 1037, 110 S.Ct. 760, 107 L.Ed.2d 776 (1970). In *O'Dell,* the Court of Appeals held that the evidence was sufficient for a jury to find a "substantial step" toward inflicting bodily injury in the defendant's acts of arming himself with a loaded shotgun, proceeding to the victim's house in a car, and honking to lure him outside even though the defendant, himself, never actually fired his weapon at the victim. *O'Dell* is typical of the case law that addresses this subject—particularly attempt-type assault cases—in the sense that the appellate court is provided with the entire factual scenario

so that it can place the appellant's acts in proper perspective in determining whether they exceed mere preparation.

4. This possibility raises the issue of voluntary abandonment of the attempted assault as a defense, assuming that the crime was complete in the first place. *See United States v. Rios,* 33 M.J. 436 (C.M.A.1991). We cannot determine if this affirmative defense is even available to the appellant because, to make that determination, we would have to know whether the appellant's abandonment of his intended crime manifested a complete and voluntary renunciation of his purpose. MODEL PENAL CODE § 5.01(4) cmt., *reprinted in* ALI MODEL PENAL CODE AND COMMENTARIES, at 296–97 (1985). To do so, we would have to speculate as to what happened after the appellant discovered that his intended victim was absent. For the same reason that we decline to speculate that the appellant completed his crime of attempted battery, we will not speculate that voluntary abandonment was the outcome either. *Schoof,* 37 M.J. at 104.

brethren in *United States v. Phrampus,* 34 M.J. 607 (A.F.C.M.R.1992) (concerning an inadequately developed factual basis of a plea to writing a worthless check), we are left with too many questions. Unlike the majority in *Anzalone,* we do not know all the facts we need to know in order to determine whether the appellant crossed the line between preparation and a *substantial* step toward commission of the intended crime. We are left to speculate about what happened and speculation is not an adequate substitute for the factual basis required by R.C.M. 910(e).

■ It is important to stress that we do *not* hold that the appellant's acts of putting a second knife in his pocket and "going after" his intended victim are merely preparatory, *as a matter of law.* What we do hold is that, without some indication of *how close* he came to completing the crime or, at least without knowing *why* he failed to complete it, we cannot say that his acts amount to a substantial step toward commission of the intended offenses, *as a matter of fact.* Accordingly, the findings of guilty to that offense cannot stand.

## VI.

■ Turning now to the matter of appropriate relief, I would normally be in favor of authorizing a rehearing for the assault offense. However, I am persuaded by Judge McLaughlin's treatment of the question of prejudice arising from the post-trial delay in this case that a rehearing would not be appropriate.

Our next logical focus is the sentence. As in like cases, we first determine if we can validly reassess the sentence. *United States v. Dresen,* 40 M.J. 462 (C.M.A.1994); *United States v. Jones,* 39 M.J. 315 (C.M.A.1994); *United States v. Peoples,* 29 M.J. 426 (C.M.A. 1990); *United States v. Sales,* 22 M.J. 305 (C.M.A.1986). Under the circumstances of this case, we find that we can, and we will,

reassess. In doing so, we note that, after having granted a defense motion to consider the concealed weapon offense and the assault on a superior petty officer to be multiplicious for sentencing purposes, the military judge further stated to the appellant that "you will be sentenced for one offense, that is, an assault upon Petty Officer [C] involving concealed weapons, the two knives." Record at 37. This statement evinced an intent by the judge to disregard the concealed weapon offense in fashioning an appropriate sentence.

In addition, the concealed weapon offense carries a maximum permissible sentence at general court-martial of, *inter alia,* a bad-conduct discharge and 1 year confinement. By the available definitions of major/minor offenses contained in the MCM, Part IV, ¶ 95c(2) and Part V, ¶ 1(3)e, this is not a serious offense.[5]

Based on the above, we cannot determine with any confidence that, absent the assault offense, the appellant's sentence would have contained its most serious component—a punitive discharge. We conclude this notwithstanding Prosecution Exhibit 6, the record of a summary court-martial of 10 April 1990, at which the appellant was convicted of carrying a concealed weapon and communicating a threat.[6]

## VII.

Accordingly, the findings of guilty to Charge II and the specification thereunder are set aside. Charge II and its specification are dismissed. The findings of guilty to Charge IV and its specification are affirmed. Only so much of the sentence as provides for confinement for 5 months, forfeiture of $500.00 pay per month for 5 months, and reduction to pay grade E–1 is affirmed.

McLAUGHLIN, Judge (concurring):

I too am not convinced of the providence of the appellant's guilty plea to aggravated as-

---

5. We recognize that the definitions have limitations, but practice reveals they are used as a rule-of-thumb when trying to answer questions of what is a felony-type offense and what is a misdemeanor-type offense.

6. This record of summary court-martial was admitted without defense objection. The record contains no evidence of the required review under Rule for Courts–Martial 1001(b)(3)(B) that would make this evidence admissible. The failure to object waives the error for our current review. Mil.R.Evid. 103.

sault under Charge II and the remaining specification. *United States v. Care*, 18 C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969). The Chief Judge's opinion fully explains the circumstances of the case and shortcomings of this plea.

Our next logical action is to determine if a rehearing is in order. Article 66(d), Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 866(d). In this regard, we draw our attention to Assignment of Error III, lack of speedy review.

The appellant was tried and convicted pursuant to his pleas on 23 August 1991. The 62–page record of trial was authenticated, served on the defense counsel at the appellant's request, and a clemency petition submitted—all by 15 October 1991. The staff judge advocate's post-trial recommendation of 2 August 1993, required under R.C.M. 1106, Manual for Courts–Martial, United States, 1984, was served on the "alternate defense" counsel only, who requested a 20–day extension which was granted.[1] The original trial defense counsel, now a civilian in private practice, was contacted, and, commendably acting *pro bono*, submitted a 7–page affidavit for clemency asking for clemency action on the punitive discharge and decrying the inordinate delay in the post-trial administration of the case. He noted the delay made his original clemency petition for early release from confinement futile. This assessment of legal error by the defense counsel was not responded to by the staff judge advocate in an addendum. *See United States v. Hill*, 27 M.J. 293 (C.M.A.1988). The convening authority acted on 14 September 1993. Therefore, over 2 unexplained years passed between the trial ending and the convening authority's action.

There is a two-tiered approach to the analysis and resolution of allegations of error due to lack of speedy post-trial review. *United States v. Dupree*, 37 M.J. 1089 (N.M.C.M.R. 1993); *United States v. Dunbar*, 28 M.J. 972, 975 (N.M.C.M.R.1989), *aff'd*, 31 M.J. 70 (C.M.A.1990); *see also United States v. Clevidence*, 14 M.J. 17 (C.M.A.1982).

On the first hand, if the inordinate, unexplained delay in the post-trial review occurred *prior* to the convening authority's action and there was prejudice, charges would be dismissed. *Dupree*, 37 M.J. at 1090. "[T]he prejudice need not relate to legal issues but may be personal prejudice to the accused in the form of diminished employment opportunities...." *Id.* at 1091.

On the other hand, dismissal for prejudice in post-trial review delay that occurs *after* convening authority's action has always required "some error in the proceedings which requires that a rehearing be held and that because of the delay appellant would be either prejudiced in the presentation of his case at a rehearing or that no useful purpose would otherwise be served by continuing the proceedings." *United States v. Gray*, 22 C.M.A. 443, 445, 47 C.M.R. 484, 486, 1973 WL 14764 (1973) (citation omitted); *see also Dupree*, 37 M.J. at 1090 (citing *Dunbar* ).

This analysis is continued in *United States v. Jenkins*, 38 M.J. 287 (C.M.A.1993). "An appellant seeking relief [for unexplained delays in post-trial processing of courts-martial] must demonstrate some real harm or legal prejudice flowing from the delay." *Id.* at 288 (citations omitted); *United States v. Henry*, 40 M.J. 722 (N.M.C.M.R.1994). In *Jenkins*, the claim of lost employment opportunity (real harm), because of extensive, unexplained post-trial processing delay before convening authority action, was "unsupported by any independent evidence." 38 M.J. at 289. This same proof problem was faced in *Dunbar*, and this court suggested a means by which this evidentiary shortcoming could be avoided. 28 M.J. at 980 n. 5.

With regard to Assignment of Error III, the appellant's case suffers two infirmities, i.e., inordinate, unexplained post-trial delay prior to the convening authority's action and error at the trial level. Therefore, we must use both tiers in analyzing to resolve the post-trial delay aspect of Assignment of Error III.

In the appellant's case we have only the trial defense counsel's affidavit that alleges the appellant lost employment where his

---

1. This, notwithstanding the appellant's right *and request on the record* to also be served a copy of the recommendation. R.C.M. 1106(f)(1); Record at 60.

mother and father worked due to a lack of a discharge. This is not factually sufficient real harm to warrant dismissal of all charges and specifications, in the absence of legal prejudice.

We are setting aside the findings to the assault on a superior petty officer offense and, under appropriate circumstances (having determined that reassessment is inapplicable), would set aside the sentence and return the record for a rehearing. However, based on the above analysis of extended, unexplained post-trial delay, and our having found error at the trial level which requires corrective action, we conclude that "the appellant would be prejudiced in the presentation of his case at a rehearing...." with regard to the assault charge. *Dunbar,* 28 M.J. at 975. Over 3½ years have passed since the trial, the appellant was released from confinement and placed on appellate leave, and we're sure the witnesses have scattered. To gather them, if possible, would take great effort and, although not always controlling, *more delay.* I believe that, both legally and equitably, the charge and specification of assault on a petty officer (in this case an alleged attempt-type battery in which there is no indication in the record that the appellant was ever near the petty officer for the purposes of touching) should be dismissed. *United States v. Claxton,* 32 M.J. 159 (C.M.A.1991); *see also United States v. Parker,* 36 M.J. 269 (C.M.A.1993).

WELCH, Senior Judge (dissenting):

I disagree with the majority's opinion that the appellant's plea of guilty to committing an attempted assault must be rejected because the record does not establish that his acts went beyond mere preparation. In my opinion, we should affirm the findings and sentence approved below.

### I. The Providence Inquiry

During the providence inquiry, the military judge listed the elements of the offense, then defined applicable legal terms. The second element included "you attempted to do bodily harm to Petty Officer Franklin [C]" and the third element included "you did so *by going after him with two knives."* Record at 17

(emphasis added). The definitions given included " '[a]n attempt to do bodily harm' is *an overt act which amounts to more than mere preparation* and is done with the apparent present ability to do bodily harm to another. Physical injury or offensive touching is not required." Record at 18 (emphasis added). Thereafter, the appellant was asked whether he *understood* the elements and the terms used to describe the elements. He responded in the *affirmative.* Then he was asked whether the elements *correctly described* his conduct. Again, he responded in the *affirmative. Id.*

Comments in the record following the military judge's request for the appellant to tell him what happened in the appellant's own words include the following:

ACCUSED: Well, it was an argument between me and Petty Officer [C] [my assistant LPO]. We got in a [sic] argument earlier that day, maybe 15 minutes before, and I went after him. *He left the engine room and maybe 3 minutes afterwards, I left right behind him after I got my knives* from Fireman [B] and by the time I went upstairs and got into the hallway, he was nowhere to be found.

. . . .

ACCUSED: After he left, *then I got one of my knives from Fireman [B] and I put the knife in my pocket and then I went upstairs looking for Petty Officer [C].* I already had one knife in my pocket and then I got another one from Fireman [B] and then I went upstairs and *when I got into the passageway, Petty Officer [C] was nowhere in sight.*

. . . .

MJ: *When you left the engine room, what did you intend to do?*

ACCUSED: *To hurt Petty Officer [C].*

. . . .

MJ: At that time, did you have the ability to hurt or harm him in some way?

ACCUSED: Yes, sir, I did.

MJ: Now, are you referring to your possession of these two knives?

ACCUSED: Yes, sir.

Record at 20–21 (emphasis added).

MJ: As you were going after Petty Officer [C], to the best of your knowledge and belief, did he realize that you were going after him?

ACCUSED: No, sir.

Record at 22.

When explaining how he concealed *two* knives on his person, the appellant described the knives as "a regular buck knife and . . . *a brass knuckle knife, a trench knife,* sir." Record at 24 (emphasis added). He said that the buck knife was the type frequently used by Sailors in engine rooms in the course of their duties, that he previously had the buck knife in his pocket before acquiring possession of the "trench knife," and that *it was the trench knife that he got from another Sailor in the engine room before he headed out to find Petty Officer C.* Record at 51 (emphasis added). The military judge viewed the two knives. Record at 50. The incident occurred during normal working hours when most of the ship's company were aboard. Record at 26. The ship, a destroyer, was in dry-dock at Naval Base, Charleston. Record at 46.

## II. Key Definitions

In my opinion, the majority's conclusion reflects an inaccurate understanding of the meaning of key phrases and words used during the providence inquiry. First, the majority does not assign appropriate meaning to the appellant's admission that he was *"going after"* Petty Officer C with two knives. According to WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY, UNABRIDGED (2d ed. 1983), "going" in this context means "moving; running . . .", *id.* at 783, and "after" means "in pursuit; moving behind; as the police are *after* him." *Id.* at 34. Second, the majority appears to expand on the clear meaning of *"preparation,"* which is defined as "devising or arranging the means or measures necessary for the commission of the offense." Manual for Courts–Martial, United States, 1984, [MCM], Part IV, ¶ 4c(2). Third, the majority appears to apply a definition that

goes somewhat beyond the acknowledged meaning of *"a substantial step toward commission of the offense,"* which means a step "strongly corroborative of the defendant's criminal intent." *United States v. Schoof,* 37 M.J. 96, 103 (C.M.A.1993) (citations omitted). I will explain the effect of these definitions later in this dissent.

## III. Points Relating to the Law of Attempts

The venerable Professors LaFave and Scott have listed four approaches taken by courts to determine whether an act of an accused was legally sufficient to consummate the crime of attempt: (1) The Proximity Approach; (2) The Probable Desistance Approach; (3) The Equivocality Approach; and (4) The Model Penal Code [MPC] Approach. 2 WAYNE R. LAFAVE AND AUSTIN W. SCOTT, SUBSTANTIVE CRIMINAL LAW, § 6.2, at 31–38 (1986). Concerning the first approach, the United States Court of Appeals for the Armed Forces [1] has correctly recognized that "[t]he rule in this country seems to be based less upon concerns with the proximity to completion of the crime than on the dangers posed by people . . . seriously intent upon committing specific crimes." *Schoof,* 37 M.J. at 102 (citation omitted). Thus, as the majority opinion appears to acknowledge, the first approach listed above does not resolve the appellant's case because physical proximity of the accused to the victim is only one factor to be considered in determining whether an attempt was committed. The second and third approaches also appear less than satisfactory. The fourth approach, however, appears instructive and worthy of extended discussion because it contains the "substantial step" language found in many state and military court decisions. Additionally, the Court of Appeals for the Armed Forces frequently quotes from the Model Penal Code and its Commentaries. *See Schoof,* 37 M.J. at 104.

The MPC requires a "substantial step . . . strongly corroborative of the actor's criminal purpose," which the draftsmen noted:

1. Formerly named the United States Court of Military Appeals.

will broaden the scope of attempt liability in a way which is consistent with the purpose of restraining dangerous persons, as (1) the emphasis is upon what the actor has already done rather than what remains to be done; (2) liability will be imposed only if some firmness of criminal purpose is shown; and (3) the conduct may be assessed in light of the defendant's statements.

LaFave, *supra*, § 6.2, at 36 (citing MPC § 5.01(6)).

As noted in LaFave, *supra*, the MPC contains certain:

categories of conduct which are not to be held insufficient as a matter of law if strongly corroborative of the actor's criminal purpose....

"(a) lying in wait, searching for or following the contemplated victim of the crime." By contrast, cases taking the proximity approach have sometimes found the act insufficient where the victim had not arrived at the intended crime scene or where the defendant was still searching out the victim.

. . . .

"(e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances." . . . .

"(f) possession, [or] collection ... of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, [or] collection ... serves no lawful purpose of the actor under the circumstances." . . . .

LaFave, *supra*, § 6.2, at 37–38 (quoting MPC § 5.01(2)).

In 1994, this Court stated:

The modern reason for sanctioning attempts "is not to deter the commission of completed crimes, but rather to subject to corrective action those individuals who have sufficiently manifested their dangerousness." ... Under the Model Penal Code, "[t]he primary purpose of punishing attempts is to neutralize dangerous individuals and not to deter dangerous acts."

*The pertinent focus is therefore on the actor's mind rather than on his actions or the proximity of the criminal endeavor to its completion.*

United States v. Smauley, 39 M.J. 853, 858 (N.M.C.M.R.1994) (citations omitted) (emphasis added).

### IV. Fallacies in the Majority's Opinion

The majority's opinion states in part that the military judge erred by accepting the appellant's plea of guilty to an attempt-type assault because:

We cannot even determine whether the appellant actually expected to find [C] waiting for him in the passageway and intended his attack to occur there. Considering the facts that passageways are ordinarily used for transit and that a few minutes had lapsed between [C]'s exit from the engine room and the appellant's, it is unlikely that he actually expected to find [C] waiting for him there.... [T]he record does not show whether the appellant ever came anywhere near [C].... [W]e are left with too many questions.

. . . .

... What we do hold is that, without some indication of *how close* he came to completing the crime, or, at least without knowing *why* he failed to complete it, we cannot say that his acts amount to a substantial step toward commission of the intended offense....

Additionally, the majority's comments appear to suggest that the military judge should have inquired about the defense of voluntary abandonment.

Frankly, I am mystified as to how the majority can reach these conclusions. I reply to each the above assertions seriatim:

a. We *can* determine the appellant's expectations during the critical time period. We do this by evaluating the totality of the circumstances presented in the light of our knowledge of the way men act and the way things are aboard a destroyer. Then, we consider the reasonable inferences that flow from the circumstances provided and arrive at conclusions about what happened on board the USS MOOSBRUGGER (DD·980) on 3

June 1991. Thus, we know that the appellant argued with Petty Officer C, a superior petty officer, in the boiler room of a destroyer. Clearly, the argument caused the appellant to go into a rage—because a man in control of his emotions does *not* go searching for his "trench knife" to settle an argument, especially when he already has a buck knife in his pocket! After arming himself with a *truly nasty and deadly weapon, while still in a rage*, the appellant left the boiler room "right behind" and in pursuit of the specific object of his chase, Petty Officer C, "maybe 3 minutes" after his prey left the boiler room. While many of the reported cases evaluating attempt cases struggle trying to determine the accused's intent, that is not a problem here. We do not have to guess because, based on words from the appellant's lips, we know exactly what was on his mind as he left the engine room after arming himself with his trench knife: he intended to "hurt Petty Officer [C]." Record at 21. He then "went upstairs looking for Petty Officer [C]." *Id.* Under these circumstances, the appellant's expectations at the time should be obvious to all: he expected to find Petty Officer C in or near the location where his feet took him—"upstairs," not far from the boiler room—and he expected to hurt Petty Officer C.

b. The majority's conclusion that "it is unlikely that [the appellant] expected to find C waiting for him" also defies logic. For the reasons stated above, that is *exactly* what the appellant expected to find. Most significantly, the appellant's exact words are "I went upstairs *looking for Petty Officer [C]*." Record at 21. Later, he acknowledged that he was "headed out to find Petty Officer [C]." Record at 51.

c. The majority's conclusion that "the record does not show whether the appellant ever came anywhere near [C]" turns a blind eye to logic and the appellant's statement to the military judge. The time from start to finish of the scenario related to the military judge was obviously brief—a matter of a few minutes, not hours. The area involved was a *destroyer,* not a carrier, not a city, merely a very small corner of the world. Notably, the clear import of what the appellant pled guilty to (i.e., "going after ... with two knives"),

according to the definitions discussed above in section II of this dissent, is that the appellant *was in pursuit* of his prey. Thus, the more reasonable interpretation of the record is that the appellant was relatively close to Petty Officer C even though he did not look into Petty Officer C's eyes. This is because a Sailor, during working hours, normally does not move too far in "maybe 3 minutes" when leaving the boiler room of a destroyer without knowledge of pursuit by an armed assailant.

d. The majority's statement that the record fails to provide "some indication of *how close* [the appellant] came to completing the crime" or "*why* the [appellant] failed to complete [the crime]" is also inaccurate. As emphasized above, the appellant was in pursuit of Petty Officer C on a destroyer. Their temporal separation was "maybe 3 minutes"; their spatial separation most probably was no more than half the length of the destroyer. Surely, the scenario presented—and sound logic—dictates that we find that the appellant was either dangerously close or reasonably close to committing the intended battery on Petty Officer C, and not the contrary. We also know the reason why the appellant failed to complete the crime: when he went "upstairs and into the passageway, Petty Officer [C] was nowhere in sight." Record at 21. That explanation is simple and easy to understand; the appellant went to the point on the ship where he thought Petty Officer C would be, but Petty Officer C was not there. Nothing more need be said. We do not need to know exactly where the intended victim was located to find the appellant's plea provident.

e. The majority's comments concerning abandonment are unnecessary and divert attention from the key issues (i.e., whether the record discloses a factual basis for the appellant's guilty plea or anything that is inconsistent with his plea). This is because the appellant said *absolutely nothing* during the providence inquiry about renunciation of his criminal purpose. *See United States v. Rios,* 33 M.J. 436, 440 (C.M.A.1991) (discussing affirmative defense of voluntary abandonment). Thus, there was no need for the military judge to inquire about the defense.

Turning to the cases discussed by the majority, I conclude they have strained to find distinctions between this case and both *United States v. Anzalone*, 41 M.J. 142 (C.M.A. 1994) and *Schoof*—which found challenged providence inquiries to be adequate—that mandate rejection of the appellant's guilty plea. A wiser course, in my opinion, when reviewing pleas of guilty to attempts where the appellant's actions may approach the " 'twilight zone' in which the line between preparation and substantive step may not be clear," *Schoof,* 37 M.J. at 103, is to remember the following comments of our immediate superior court:

> Quite simply, where an accused pleads guilty and during the providence inquiry admits that he went beyond mere preparation and points to a particular action that satisfies himself on this point, it is neither legally nor logically well-founded to say that actions that may be ambiguous on this point fall short of the line "as a matter of law" so as to be substantially inconsistent with the guilty plea.

*Schoof,* 37 M.J. at 103 (citations omitted). I submit that a similar principle should apply when evaluating the stated factual basis for a guilty plea. Likewise, a "military judge is not required ... to embark on a mindless fishing expedition to ferret out or negate all possible defenses or potential inconsistencies." *United States v. Jackson*, 23 M.J. 650, 652 (N.M.C.M.R.1986), *petition denied,* 24 M.J. 405 (C.M.A.1987). The facts revealed by an accused must merely "objectively support th[e] plea." *United States v. Schwabauer,* 37 M.J. 338, 341 (C.M.A.1993) (citation omitted). At the bottom line, "rejection of [a guilty plea] requires that the record of trial show a 'substantial basis' in law and fact for questioning the guilty plea." *United States v. Prater,* 32 M.J. 433, 436 (C.M.A.1991). There is simply no such basis in this case.

My reading of *Anzalone, Schoof,* and *Smauley* leads me to conclude that our precedent tracks the Model Penal Code approach discussed above in section III of this dissent. Therefore, in evaluating the appellant's case, we should remember that the requirement for a "substantial step ... strongly corroborative of the actor's criminal

purpose" principle is intended to *broaden the scope of attempt liability consistent with the purpose of restraining dangerous persons,* as indicated by the three distinguishing features of the MPC approach listed above in section III. If we review the appellant's case to determine how his statements relate to these distinguishing features, we find three strong reasons for affirming his conviction. First, *looking at what he did,* rather than what he was not able to do, we find that he searched for a second deadly weapon, his trench knife, found it, then went out of the boiler room and up a ladder and into a passageway searching for Petty Officer C. Second, *looking for a firmness of criminal purpose,* we know that the appellant intended to hurt Petty Officer C when he was searching for him. Third, *looking at the appellant's statements,* we can readily assess his conduct—in his own words he told us that his search for Petty Officer C was undertaken for one purpose: to hurt him.

The appellant's conduct also falls within three of the categories of conduct listed above in section III which "illustrate how the Code approach would achieve results different from the other tests," LaFave, *supra,* § 6.2, at 37. Specifically, he was *searching for or following his contemplated victim,* he *possessed an item (the trench knife) specifically designed for an unlawful purpose,* and he *possessed an item (the trench knife) for use in the commission of the crime intended that served no lawful purpose under the circumstances.* Using this MPC approach to assess the providence inquiry before us, it appears beyond dispute that the appellant's totally unacceptable conduct on 3 June 1991 on board his ship is precisely the type of conduct the MPC approach is intended to criminalize.

I believe we should evaluate this case in the manner followed by our brethren on the Nevada Supreme Court in *Van Bell v. State,* 105 Nev. 352, 775 P.2d 1273 (1989), when they affirmed a conviction of attempted sexual assault on a young girl. Their logic was eminently sound:

> [W]e [have] also held that *when the design of a person to commit a crime is clearly*

*shown, slight acts done in furtherance of that crime will constitute an attempt.*

. . . .

Additionally, in our review of the elements of an "attempt" offense, *we emphasize the inverse relationship which exists between the defendant's intent to commit the crime and the performance of an overt act toward the commission of the crime. See People v. Dillon,* 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697 (1983) (concluding that the plainer the intent to commit the offense, the more likely that steps taken in the early stages of the commission of the crime will satisfy the overt act requirement). . . .

In the present case, we have the *clearest evidence of appellant's intent to commit sexual assault on the young girl. He stipulated that this was his intent.* Given the *unequivocal evidence of appellant's intent to commit the crime,* we hold that his acts of driving toward the apartment where the girl was allegedly waiting and purchasing vaseline to use as a lubricant sufficed for attempt liability.

105 Nev. at 354–55, 775 P.2d at 1275–76 (emphasis added) (citation omitted).

There is another simple way to evaluate this case. It is based on the definitions and principles stated above in section II of this dissent. Based on the definition of "preparation," we can readily conclude that the preparation phase of the crime charged occurred in the boiler room when the appellant looked for and acquired his trench knife. That phase ended when he departed the engine room armed with his trench knife and determined to hurt Petty Officer C. At that point, he crossed the line of departure and headed "upstairs looking for Petty Officer C." Record at 21. He was then in the "search and destroy mode" (my words) heading to a location where he obviously thought Petty Officer C might be. His search for Petty Officer C was "strongly corroborative of his criminal intent," which means that it was a "substantial step toward commission of the offense" intended.

Obviously, the majority must "call them as they see them." However, I believe they have applied too exacting a requirement in reviewing this case. They have, in essence, examined this guilty plea case with the degree of inquisitiveness normally used when reviewing records of contested cases. In so doing, they fail to consider that "in a borderline [guilty plea] case the military judge can give weight to the defense evaluation of the evidence." *United States v. Clark,* 28 M.J. 401, 407 (C.M.A.1989). Most significantly, in my opinion, their position decriminalizes conduct that is totally contrary to good order and discipline in the Navy and Marine Corps. Stated otherwise, even though the majority states that their decision is based on a "matter of fact," I read it as a determination that searching for a victim with the specific intent to harm the victim cannot be an attempt as a matter of law. Such a result is contrary to the enlightened approach discussed above in paragraph 2 of section III of this dissent and, in particular, this Court's previously expressed position that the focus of attention in an attempt case is on the actor's mind, not his proximity to the intended victim. *See Smauley,* 39 M.J. at 858.

Moving to another aspect of this case, I note that on 21 August 1991, the appellant and his counsel signed a pretrial agreement which offered his pleas of guilty in exchange for the convening authority's promise to refer the charges to a special court-martial, vice a general court-martial. Appellate Exs. I, II. Later, in a clemency letter to the convening authority, dated 15 October 1991, the trial defense counsel emphasized that:

> by pleading guilty the government was spared the considerable effort and expense required for trial preparation and related trial expenses such as the production of witnesses. If this case had been tried as a contested matter, the government would have been forced to produce numerous active duty military personnel . . . which would have included at least six or seven personnel from engineering.

(Trial Defense Counsel's Petition for Clemency ltr of 15 Oct 91). Now, over 3 years after the trial, we have the situation we see so often. On review, the appellate defense counsel, without offering anything new or exculpatory, contends that the guilty finding based on a plea of guilty should be set aside. Setting aside the findings could, in theory,

permit the Government to retry the appellant. However, as a practical matter, if these findings of guilty are set aside in 1995, the appellant will probably not be tried again because the incident giving rise to the charges occurred in mid–1991, the witnesses are likely be spread around the world, and the appellant, I believe, is on appellate leave.[2] Thus, setting aside the findings could grant the appellant a windfall and place him in a much better position today than he was when he walked into his court-martial. For reasons such as this, we should reverse guilty-plea convictions only when absolutely required by the letter and spirit of the law, a requirement not existing in this case, in my opinion.

## V. The Sentence

In my opinion, this Court should affirm the sentence adjudged even if it disapproves the findings concerning Charge II and the specification thereunder. In conducting a reassessment per *United States v. Jones*, 39 M.J. 315 (C.M.A.1994), this Court should give considerable weight to the fact that the military judge (a) considered the appellant's 10 April 1990 *summary court-martial conviction for violating Article 134, UCMJ, by both communicating a threat and unlawfully carrying a concealed weapon,* (b) heard the entire providence inquiry, (c) *viewed the trench knife* that the appellant searched for and possessed when he went after Petty Officer C, and (d) understood the need for good order and discipline in the United States

Navy. Under these circumstances, I am confident that the military judge would have adjudged a bad-conduct discharge.

Lastly, I do not agree with the majority's conclusion that the offense of which the appellant stands convicted is "not a serious offense." The circumstances surrounding the commission of the offense should be considered in determining whether an offense is minor. MCM, Part V, ¶ 1(3)e. When the circumstances developed during the providence inquiry are considered, the offense committed by the appellant—carrying a concealed weapon—*is* a serious offense, in my opinion.

---

2. Perhaps it may be time for the United States Court of Appeals for the Armed Forces to revisit *United States v. Care*, 18 C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969), and bring military practice in line with that followed in the Federal Courts. After all, *Care* was based on *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), which

came to be viewed as requiring a plea to be set aside as a rule when a violation of Rule 11 occurred. (Citation omitted). However, *McCarthy's* holding was *limited by the addition of Rule 11(h) in 1983. Rule 11(h) provides "[a]ny variance from the procedures required by this rule which does not affect substantial rights shall be disregarded."*
*United States v. Goldberg*, 862 F.2d 101, 106 (6th Cir.1988) (emphasis added). "[T]here are two possible remedies when a Rule 11 violation occurs. The first alternative is to vacate the plea and remand for repleading.... The second al-

ternative is to remand the case *to permit the government to supplement the record* on the issue [deemed relevant by the appellate court]...." *Goldberg*, 862 F.2d at 106–07 (emphasis added). See also Judge Cox's comments in *United States v. Penister*, 25 M.J. 148 (C.M.A.1987) construing Article 45, UCMJ. *Care*, I add, was an exercise of the Court of Military Appeals supervisory authority, and a court should not exercise its supervisory authority in a vacuum and fail " 'to give appropriate ... weight to' the relevant interest of the victims of crime and to 'the practical problems of' a retrial." *United States v. Remai*, 19 M.J. 229, 231 (C.M.A.1985) (quoting *United States v. Hasting*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)). Military courts need a process short of a rehearing that will permit the Government to supplement the record with information that will establish the factual basis for acceptance of a plea of guilty, in my opinion.